AO 106 (Rev. 06/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

**FILED**

for the

Eastern District of Missouri

'JUL - 9 2019

| | |
|---|---|
| **In the Matter of the Search of** ) | U. S. DISTRICT COURT<br>EASTERN DISTRICT OF MO<br>ST. LOUIS |
| **The premises located at 25 N. Central Avenue, Apartment** ) | |
| **#309, St. Louis, Missouri 63105, is more fully described** ) | Case No. 4:19 MJ 3165 (NCC) |
| as an apartment in a multi-unit mid-rise ) | |
| residence, constructed of red brick and steel with approximately ) | |
| six floors with floors two through six having balconies. The word ) | |
| Ceylon appears on the outside of the building indicating the name ) | |
| of the management company that controls the property. ) | |

## APPLICATION FOR A SEARCH WARRANT

I, __Chad Ramey__, a federal law enforcement officer or an attorney for the government request a search warrant and state under penalty of perjury that I have reason to believe that on the following property:

### The premises located at 325 N. Central Avenue, Apartment #309, St. Louis, MO 63105, as fully described above,

located in the _____ EASTERN _____ District of _____ MISSOURI _____, there is now concealed

### see attached LIST

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

    ✓ evidence of a crime;

    ✓ contraband, fruits of crime, or other items illegally possessed;

    ✓ property designed for use, intended for use, or used in committing a crime;

    ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| Title 21, U.S.C., §§ 846, 841(a)(1) | Conspiracy to possess with intent to distribute controlled substance(s) |

The application is based on these facts:

    SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE.

    ✓ Continued on the attached sheet.

    ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

CHAD RAMEY, Task Force Officer

Federal Bureau of Investigation

*Printed name and title*

**Sworn to before me and signed in my presence.**

Date: _____ July 9, 2019 _____

*Judge's signature*

Hon. Noelle C. Collins, U.S. Magistrate Judge

City and State: _____ St. Louis, MO _____

*Printed name and title*

AUSA: STEPHEN CASEY

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Chad Ramey, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I have been a police officer for the Decatur Police Department, Decatur, Illinois for twenty-four (24) years. For the past twenty (20) years I have been assigned to the Decatur Police Department Street Crimes Unit. I am also assigned as a Task Force Officer with the Federal Bureau of Investigation, assigned to the Eastern Illinois Violent Criminal Enterprise and Drug Trafficking Organization Task Force. I am assigned to investigate complex criminal enterprises, including Drug Trafficking Organizations (DTO). I have participated in narcotics investigations involving the manufacture, transportation, and distribution of controlled substances. These investigations have resulted in the seizure of controlled substances and proceeds from the sale of controlled substances, as well as arrests and convictions of drug traffickers. I am familiar with, and have utilized, normal methods of investigation, including, but not limited to physical and electronic surveillance, questioning of witnesses, the use of search and arrest warrants, the use of informants, the use of pen registers, analysis of telephone records, and the utilization of undercover agents.

2.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

3.      I make this affidavit in support of an application for search warrants for the property listed below, and the seizure and search of the items specified in Attachment A, which items constitute instrumentalities, fruits, and evidence of violations of Title 21, United States Code,

Section 841(a)(1) (Possession with Intent to Distribute and Distribution of a Controlled Substance); Title 21, United States Code, Section 843(b) (Unlawful Use of a Communication Facility); Title 21, United States Code, Section 846 (Conspiracy to Possess with Intent to Distribute and Distribution of a Controlled Substance); Title 21, United States Code, Section 848 (Engaging in a Continuing Criminal Enterprise); Title 18, United States Code, Section 1952 (Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises); and Title 18, United States Code, Section 1956 (Money Laundering) (hereinafter referred to as "target offenses"). There is also probable cause to believe that information and items described in Attachment A will constitute evidence of this criminal violation, and will lead to the identification of additional individuals who are engaged in the commission of this offense.

## LOCATION TO BE SEARCHED

4.     **The premises located at 25 N. Central Avenue, Apartment #309, St. Louis, Missouri (hereinafter referred to as "target location"), 63105:** The premises located at 25 N. Central Avenue #309, St. Louis, Missouri 63105 is more fully described as an apartment in a multi-unit mid-rise residence, constructed of red brick and steel with approximately six floors with floors two through six having balconies. The word Ceylon appears on the outside of the building indicating the name of the management company that controls the property.

5.     The **target location** is COURTNEY TYLER JOHNSON'S (hereinafter "JOHNSON") primary residence. On March 10, 2019, agents observed JOHNSON enter his 2015 Cadillac Escalade, displaying Illinois license plate Q732877 and drive away from the garage of the **target location**. Rental records indicate that JOHNSON uses a fictitious name to rent Apartment #309, but the phone number associated with the renter of Apartment #309 is a phone number JOHNSON has utilized during this investigation and continues to utilize. Further, during

2

the March 13, 2019, to May 8, 2019, period of interception of wire communications of COURTNEY JOHNSON's cellular telephones, COURTNEY JOHNSON confirmed on March 24, 2019, over a telephone call with GABRIELLE JOHNSON that COURTNEY JOHNSON's apartment number is #309, which matched the phone number associated with the rental records for the **target location**.

6.      Throughout the investigation agents were able to utilize cellular tower locations and precision location data for both of JOHNSON'S cellular telephones. Investigators were also able to receive electronic surveillance data for several vehicles utilized by JOHNSON. During the investigation, and as recent as July 3rd, 2019, cellular telephone location data indicated JOHNSON is utilizing the **target location** as his primary residence.

## OVERVIEW OF THE INVESTIGATION

7.      Federal Bureau of Investigation (FBI) Special Agent Mark Hill has been involved in the investigation concerning the sale and delivery of cocaine and cannabis by JOHNSON and members of his Drug Trafficking Organization (JOHNSON DTO) for the more than twenty-four months. Throughout the course of this investigation, agents have used a number of investigatory tools to identify the members of the JOHNSON DTO, the means and methods used by the JOHNSON DTO, the facilities maintained by the JOHNSON DTO to further their drug trafficking activities, and the premises and vehicles used by the JOHNSON DTO to promote and conceal those drug-trafficking activities.

8.      In July 2016, the FBI initiated a joint-investigation with the Decatur Police Department regarding the illegal drug trafficking activity of the JOHNSON DTO based on source information that JOHNSON is a major drug source for the Decatur, Illinois area. During the course of the investigation, I have learned about the membership and operations of the JOHNSON DTO

3

through discussions with confidential sources, discussions with other law enforcement officers, and surveillance of JOHNSON DTO members.

9.      Throughout this investigation confidential source reporting has been consistent in identifying JOHNSON as the main supplier of cocaine to the Macon County, Illinois area. These sources have also admitted to purchasing both powder and crack cocaine from JOHNSON's main distributors. All confidential sources state that JOHNSON will not deal with any buyer direct.

10.     Investigators also obtained court-authorized telephone monitoring for two separate cellular telephones utilized by JOHNSON. During this monitoring, JOHNON has communicated on these telephones with several of the co-conspirators as well as sources of controlled substances. JOHNSON has also had conversations related to controlled substances to include prices for future supplies of controlled substances, obtaining currency from co-conspirators, and discussions of purchasing properties. Precision location information indicates these telephones are often at the **target location** and have been there during pertinent intercepted calls.

11.     JOHNSON and other members of the JOHNSON DTO utilize several vehicles to facilitate and promote its drug trafficking conspiracy by further transporting marijuana for re-distribution, transporting money for the purchase of marijuana, and traveling to meeting locations in order to arrange for the transfer of marijuana and currency for the purpose of furthering the JOHNSON DTO's drug trafficking activity. Several of these vehicles have been observed parked at the **target location**.

12.     For example, as described below, JOHNSON has repeatedly utilized his 2013 Chrysler minivan to further drug trafficking. Electronic and visual surveillance has revealed this vehicle frequently parked at the **target location**. Further, electronic and visual surveillance has revealed JOHNSON depart the **target location** in the minivan and travel to Decatur, Illinois in

4

order to conduct tasks to further his drug trafficking, to include pick-ups at his storage units, stops at various residences, and/or other deliveries. JOHNSON then travels directly back to the **target location** after completing those tasks.

## TARGET SUBJECTS

13.     The subjects associated with the JOHNSON DTO include:

a.     COURTNEY TYLER JOHNSON – identified leader of the JOHNSON DTO. JOHNSON's primary residence has been identified as the **target location**. JOHNSON also stays at the residence occupied by his mother (Jennifer Fisher) located at 3808 Eagle Claw Drive in Springfield, Illinois. JOHNSON has no known legitimate employment. JOHNSON has had a series of demonstrated examples of drug trafficking. In September 2009, JOHNSON was stopped driving by a DEA Task Force Officer on Interstate 270 and Highway 59 in Illinois. The traffic stop yielded $14,267 in United States currency and an apparent drug ledger with weight and currency amounts. A passenger in the vehicle was identified as DEANDRI BURTON. In January 2011, JOHNSON was arrested by the Brownsburg, Indiana Police Department after approximately thirty (30) pounds of marijuana was located in the truck of a car JOHNSON was the passenger in. In October 2014, the Decatur Police Department was contacted by a United States Postal Inspector regarding a seized package containing a kilogram of suspected cocaine. The package was addressed to a subject who resides at 955 W. Center Street, Decatur, Illinois. Investigators determined that another female, not the name listed on the package, was the actual resident on W. Center Street. The female was contacted and interviewed by law enforcement, who stated the cocaine belonged to JOHNSON. The female advised JOHNSON was paying her $1,000 to have the cocaine package delivered to her address. The female advised she had accepted one other package for JOHNSON in the past.

5

b.     GABRIELLE JOHNSON – JOHNSON's sister who was observed delivering drug proceeds in Chicago, Illinois on behalf of JOHNSON.

c.     TIMOTHY EALEY – EALEY has been identified as one of JOHNSON's re-distributors of cocaine and cannabis in the Decatur, Illinois area. Two controlled purchases of cocaine from EALEY and EALEY's son, DALTON DREW, have been made. Toll records from one of JOHNSON's known cellular phone numbers shows more than 150 contacts with a cellular telephone utilized by EALEY since December 2018.

d.     DEANDRI BURTON – BURTON has been identified as one of JOHNSON's re-distributors of crack cocaine in the Decatur, Illinois area. BURTON has traveled with JOHNSON on several occasions. Nine controlled purchases of crack cocaine from BURTON have been made. Toll records from one of JOHNSON's known cellular phone numbers shows more than 200 contacts with a cellular telephone utilized by BURTON since December 2018.

e.     JENNIFER FISHER – JOHNSON's mother whose primary residence is 3808 Eagle Claw Drive in Springfield, Illinois. FISHER has been identified as a launderer of drug proceeds for COURTNEY JOHNSON. FISHER has been identified operating vehicles COURTNEY JOHNSON commonly utilizes for furtherance of his drug trafficking organization.

f.     JAMES ALLEN – ALLEN has been identified as a co-conspirator with JOHNSON in trafficking controlled substances.

g.     LINDELL J. WILLEY – WILLEY admitted transporting illegal narcotics to storage locations in Kansas City, Missouri (for ALLEN) and storage units in Springfield, Illinois and Decatur, Illinois (for JOHNSON). WILLEY was driving a black Chevy truck that was stopped on December 21, 2018 in St. Joseph, Missouri where law enforcement discovered and seized more than $665,000 in U.S. currency.

6

## PROBABLE CAUSE

14.     Based on my training and experience and that of my team, I know that controlling a drug trafficking and money laundering operation to the magnitude of the JOHNSON DTO generates a substantial amount of documents and records through its day-to-day operations. As described more fully below, the investigation to date has revealed that the DTO has already generated substantial records and documents that are likely to be kept inside the **target location**.

### *Records Related to Storage Lockers at the Target Location*

15.     The investigation has revealed that JOHNSON utilizes storage lockers to store illegal narcotics. On February 20, 2017, JOHNSON was seen by law enforcement entering the gated, storage facility known as Northwest Mini-Storage, located at 2330 Route 121, NW, in Decatur, Illinois.

16.     On February 21, 2017, documents relating to storage Unit F19 ("Unit F19") were obtained showing that particular unit is assigned to and rented by Kathryn Kelsheimer, JOHNSON's grandmother. The storage unit assigned to Kelsheimer is located in the same area within the Northwest Mini-Storage premises to where law enforcement saw JOHNSON's vehicle parked on February 20, 2017. Records indicate that access into and out of the facility is monitored through an access code individual to each renter. The access code assigned to Kelsheimer was used the same day and approximate time that law enforcement saw JOHNSON enter the facility on February 20, 2017.

17.     On March 2, 2017, a pole camera was installed in order to capture activity outside of Unit F19. Pole camera video showed JOHNSON at Unit F19 on thirteen (13) occasions between September 28, 2017, and November 9, 2017. Likewise, the access code assigned to Kelsheimer

was used for entry and exit for each of the thirteen (13) times the storage locker was accessed between September 28, 2017, and November 9, 2017.

18.     Pole camera video from February 5, 2018, through July 25, 2018, revealed 20 visits to Unit F19 by JOHNSON. On three occasions, JOHNSON was observed opening up Unit F19 while a large quad-cab pickup pulling a large trailer pulled up and stopped outside of Unit F19. On sixteen of the remaining seventeen visits between February 5, 2018, and July 25, 2018, JOHNSON entered Unit F19, usually after dark, and exited carrying items such as boxes and what appeared to be trash bags. Visits lasted one minute to twelve minutes.

19.     On July 16, 2018, a District Court Judge in the Central District of Illinois issued an order authorizing the monitoring and recording of visual, non-verbal conduct and activities inside of Unit F19 for a period of 30 days. On July 17, 2018, agents were able to install video surveillance equipment inside Unit F19. On August 16, 2018, a Magistrate Judge in the Central District of Illinois issued an order re-authorizing the monitoring and recording of visual, non-verbal conduct and activities inside of Unit F19 for a period of 30 days. Video surveillance during this time period revealed JOHNSON arriving at Unit F19, and often removing clear, sealed packages or other items from bins within the storage unit.

20.     On August 29, 2018, a magistrate judge in the Central District of Illinois issued a search warrant for Unit F19 to search the contents of the storage unit. Agents did not request authority to seize anything found in the storage unit. That day, law enforcement officers executed the search warrant at Unit F19. The results of the search revealed twelve (12) large brown boxes containing a combined total of approximately one-hundred and sixty-one (161) vacuum-sealed clear packs containing what investigators believe is at least one pound of cannabis in each pack. The cannabis was packed in a zip-lock type clear bag then secured again in a vacuum-sealed bag.

8

The unopened boxes were sealed with clear packaging tape. Inside the sealed brown boxes were thick black plastic trash-type bags that were secured with a zip-tie fastener. Inside each black plastic bag were at least eighteen (18) clear, vacuum-sealed packs of cannabis. Agents did not seize the cannabis in order to conduct further investigation into the JOHNSON DTO.

21.     Since the search warrant, JOHNSON continues to occupy and utilized Unit F19. JOHNSON's visits to Unit F19 are conducted in a similar fashion as described above (after dark, short duration, removing bags or boxes). Investigators believe the items removed by JOHNSON contain cannabis. Morevoer, it is clear that Kelsheimer is a nominee used by JOHNSON to conceal his possession and use of Unit F19. Accordingly, is likely that records related to Unit F19 will be located at JOHNSON'S primary residence, the **target location**.

22.     The investigation has revealed JOHNSON frequents other storage lockers and removes or places items (boxes or suitcases) suspected of containing drugs and/or proceeds. Specifically, JOHNSON has been observed at: Northwest Mini Storage Unit A42, Capitol Storage Unit 190, and Storage Masters West Main Unit G7. Investigators believe it is likely that documentation related to these storage units will be located at the **target location**.

### Financial/Travel Records at the Target Location

23.     Due to the large amount of bulk U.S. currency generated from the sale of illegal drugs by the JOHNSON DTO, and evidence related to JOHNSON'S visits to various financial institutions, investigators have issued subpoenas for various bank records related to JOHNSON. Investigators identified a Bank of America account in the name of COURTNEY JOHNSON addressed to 3808 Eagle Claw, Springfield, Illinois. The records show unusually large amounts of cash deposits made in the St. Louis, Missouri area. Investigators also located check card

9

withdrawals from January 2019 through May 2019 from JOHNSON'S Bank of America account. Each month the same amount was paid to Ceylon, the corporate landlord of the **target location**.

24.     Although investigators have located the Bank of America account, they have only issued subpoenas regarding known accounts. It is not known at this time if JOHNSON has additional bank accounts at other banking institutions; or bank accounts listed in other subject's names that he utilizes. Accordingly, investigators believe that JOHNSON likely keeps and maintains bank records and tax records associated with the Bank of America account, as well as potentially other accounts, at the **target location**.

25.     Based on intercepted calls wherein JOHNSON states he is depositing money (see Paragraph 47), investigators have obtained surveillance video from various ATM locations which showed JOHNSON depositing large bundles of U.S. currency, typically in St. Louis. Large cash deposits were also made in San Francisco, California and the Atlanta, Georgia area. Investigators believe it is likely JOHNSON has records related to these ATM deposits at the **target location**.

26.     Further, investigators identified JOHNSON (and his associates) traveling at least monthly, and sometimes multiple times a month, to Miami, Atlanta, Los Angeles, San Francisco, San Diego and Dubai, aside from his trips to Kansas City and the Springfield/Decatur, Illinois areas. Expenses for these trips were paid from the Bank of America account. The bank records show JOHNSON purchased airline tickets, rental cars, and hotel rooms. The account records also showed payments to Uber and Priceline. Investigators believe JOHNSON's travel was associated with drug trafficking or money laundering activity. This belief is based on intercepted calls to JOHNSON's source of supply wherein the source was located in California. Further, JOHNSON directed others, such as WILLEY, to travel to source cities in California to obtain drugs. Accordingly, based on the extensive travel by him and his associates, investigators believe it is

likely that records of JOHNSON'S travel, or those of his associates, as depicted by his bank statements, will likely be located at the **target location**.

27.     During the course of the investigation, JOHNSON does not appear to have any type of job other than trafficking drugs. However, investigators have found that JOHNSON lives an extravagant lifestyle: the expense of the **target location**, payment for the storage lockers, owning numerous vehicles, and extensive travel. Records related to these expenses and others are likely kept at the **target location** and are further evidence of money laundering activity.

### *Drug Ledgers*

28.     Based on training and experience, investigators know that drug traffickers that are part of large, complex DTO's such as the JOHNSON DTO, typically maintain drug ledgers. Due to the numerous amounts of bulk marijuana purchases from multiple sources-of-supply, multiple local clients in the area, as well as the multiple types/strands of bulk marijuana which the JOHNSON DTO obtains and distributes; investigators are aware that members of the aforementioned DTO will require the aid of constantly updated ledgers to manage the daily operations of an organization with so many moving components.

29.     Physical proof of the JOHNSON DTO's usage of ledgers is evident from the load received on May 1, 2019. On or about May 1, 2019, JOHNSON departed the **target location** and traveled to Decatur, Illinois. On May 1, 2019, at approximately 6:04 p.m., JOHNSON placed an outgoing call to JACKIE CAMPBELL and arranged to meet. Law enforcement surveillance teams observed JOHNSON utilizing CAMPBELL's house at approximately the same time. At approximately 6:02 p.m. on May 1, 2019, JOHNSON called his source of supply. Agents intercepted the call. During that call, the source informed JOHNSON that the driver was named

11

"Carrots" and that he was scheduled to arrive between 7:08 p.m. and 7:15 p.m. After that phone call ended, JOHNSON texted the same number this message, "2500 Peru Rd 62522."

30.     Agents set up surveillance of 2500 Peru Road. There, agents observed JOHNSON make contact with a semi-tractor trailer at approximately 7:13 p.m., which is the same time JOHNSON received a call from the source in which JOHNSON asked, "is that the right one?" and the source replied, "yeah, yeah, that's the right dude." JOHNSON's minivan was behind CAMPBELL's residence.

31.     Around 7:19 p.m., JOHNSON unloaded several large boxes from the back of the semi-tractor trailer. CAMPBELL helped JOHNSON unload the boxes and place several in both JOHNSON's Chrysler van as well as CAMPBELL's tan GMC sport-utility vehicle.

32.     JOHNSON and CAMPBELL got into CAMPBELL's GMC and drove away. An unknown male got into JOHNSON's van and drove away as well. Electronic and visual surveillance revealed that JOHNSON's minivan drove to the Storage Masters storage facility. By 7:37 p.m., surveillance followed both vehicles as they drove to an address believed to be associated with EALEY. At 9:51 p.m., JOHNSON received an intercepted call from the source. During that call, JOHNSON confirmed with the source that he received ten boxes and that "box 22" has a list of what's in every box. JOHNSON eventually left EALEY'S residence and returned directly to the **target location**. Based on the investigation, investigators believe it is likely that JOHNSON brought the "list" referenced in the intercepted call with him to the **target location**.

33.     Later on May 1, 2019, Illinois State Police Trooper Heard stopped the semi-truck near Benton, Illinois to conduct a routine commercial motor vehicle inspection. During a probable cause search, the semi-truck was found to contain 12 large boxes similar to the boxes unloaded by

12

JOHNSON and CAMPBELL. There was a total of 200 individually vacuum-sealed bags of cannabis within those 12 boxes.

34.     Aside from that described herein, investigators intercepted several telephone calls between JOHNSON and his sources and customers discussing drug orders, amounts owed, shipment dates, and payment dates. During many of these conversations, JOHNSON informed the person the outstanding drug balance or the amount of drugs ordered.

35.     During many of the intercepted calls related to drug trafficking, electronic surveillance showed JOHNSON at the **target location** indicating that JOHNSON oversees his DTO from the **target location**. Based on my training and experience and that of my team, it is likely that ledgers – like the "list" described above (see Paragraph 32) – will be at the **target location**.

### *Records Showing Straw Purchases*

36.     Investigators know that drug traffickers often register or buy assets in the names of other subjects to attempt to thwart law enforcement detection and to attempt to insulate the asset from being seized by law enforcement.  As described herein, JOHNSON has utilized a number of storage units registered or rented in the names of others. JOHNSON has also utilized different vehicles registered to others to conduct his drug trafficking operation. JOHNSON has attempted to disguise his ownership of the **target location**. Accordingly, investigators believe it is likely that documents and records associated with the renting or purchase of the storage lockers, vehicles, and showing ownership/possession of the **target location**, will be located at the **target location**.

### *Proceeds at the Target Location*

37.     The investigation has revealed that the JOHNSON DTO has generated substantial drug proceeds. Investigators know that drug trafficking operations that distribute the amount of

drugs that JOHNSON distributes routinely have large amounts of bulk U.S. currency in different locations. Investigators believe based on the investigation to date that JOHNSON typically keeps a portion of those proceeds at his primary residence: first 212 S. Meramec Avenue, Clayton, Missouri, then starting in January 2019, the **target location**.[1]

38.    On November 8, 2018, Kansas City P.D. (Missouri) contacted investigators and advised that electronic surveillance of LINDELL WILLEY'S black Chevrolet truck indicated it was headed eastbound towards Illinois. Electronic surveillance revealed WILLEY's truck drove directly to the parking lot of St. Louis Galleria Mall. Meanwhile, electronic surveillance showed JOHNSON'S black Dodge Charger departed 212 S. Meramec approximately 13 minutes after WILLEY'S vehicle arrived at the Galleria Mall parking lot and proceeded directly to the Galleria Mall. JOHNSON'S Dodge Charger arrived at Galleria Mall and stopped in the same location where WILLEY's Chevrolet truck was parked. After one minute, both vehicles separated and WILLEY's Chevrolet truck headed westbound to Kansas City while JOHNSON returned to 212 S. Meramec.

39.    Later, on November 13, 2018 investigators visually surveilled WILLEY drive to Capitol Storage located in Springfield, Illinois where he was met by JOHNSON. Both JOHNSON and WILLEY entered the storage unit facility and went to JOHNSON'S storage unit. WILLEY removed two boxes from his vehicle and JOHNSON placed those two boxes inside of his storage unit. The trailer and storage unit were then closed and both vehicles left the storage facility and drove to JOHNSON's storage unit at Northwest Mini Storage. Approximately 11 boxes were unloaded from WILLEY's trailer and carried into JOHNSON's storage unit.

---

[1] JOHNSON moved from this address to the **target location** in January 2019.

14

40.     On December 20, 2018, electronic surveillance again showed WILLEY at the Galleria Mall. Due to the electronic surveillance unit not working correctly on JOHNSON's vehicle, investigators were unable to observe if JOHNSON's vehicle went to Galleria Mall to meet with WILLEY. WILLEY's vehicle was only in the Galleria Mall parking lot for six minutes before exiting the parking lot. WILLEY'S vehicle returned directly to his residence in the Kanasa City area. Investigators believe, based on previous surveillance, WILLEY's trip was solely to pick up drug proceeds from JOHNSON. These proceeds were intended to be delivered to California for a future shipment of illegal narcotics.

41.     On December 21, 2018, WILLEY was stopped driving his vehicle with $665,170 inside. During a subsequent interview, WILLEY advised he transported illegal narcotics and U.S. currency for JAMES ALLEN and JOHNSON. WILLEY stated, under the direction of ALLEN and JOHNSON, he obtained illegal narcotics in California then delivered the illegal narcotics to ALLEN in Kansas City then to JOHNSON at various storage units in Springfield and Decatur, Illinois. WILLEY advised he commonly travels to a mall in St. Louis to obtain money from JOHNSON to be transported to California. WILLEY stated JOHNSON commonly placed the money in duffle bags and suitcases. WILLEY advised part of the seized money came from JOHNSON to transport to California.

42.     Accordingly, on November 8 and December 20, JOHNSON appears to have brought the proceeds to pay WILLEY from 212 S. Meramec – his primary residence at the time – to the meeting at the Galleria Mall.

43. On March 18, 2019, agents observed JOHNSON exiting 3808 Eagle Claw carrying two large duffle bags/luggage bags – like those described by WILLEY – and placed them in the rear cargo area of the minivan. JOHNSON traveled to meet with identified co-conspirators WESLEY CONSTANT, CHARLES DRAKE and DEANDRI BURTON. While in route to the meeting, JOHNSON received an incoming call from CHRISTOPHER BRADFORD that was intercepted by agents. BRADFORD is a known trafficker of cannabis in the Decatur and Springfield areas. BRADFORD told JOHNSON that he called because JOHNSON had told BRADFORD to call when he was "half way through them." BRADFORD told JOHNSON that BRADFORD was home. JOHNSON replied that he would visit BRADFORD later.

44. Based on training and experience and the investigation to date, investigators believe that BRADFORD told JOHNSON that he has sold half his supply of drugs that he received from JOHNSON. Investigators further believe that BRADFORD is informing JOHNSON that BRADFORD has proceeds to pay JOHNSON. BRADFORD wanted JOHNSON to come to his residence to pick up the proceeds for the distributed drugs.

45. Continuing on March 18, 2019, JOHNSON met with CONSTANT, BURTON and DRAKE in Decatur and drove the minivan back to the Springfield area. When JOHNSON entered the Springfield, Illinois area he called his mother JENNIFER FISHER. The call was intercepted by agents. JOHNSON told FISHER he would be pulling up soon. FISHER told JOHNSON to "get that stuff out of [her] back seat." JOHNSON arrived at 3808 Eagle Claw, the residence of FISHER. JOHNSON removed small items from the back-seat area of FISHER'S Chrysler 300 and placed the items in the minivan. Based on the investigation to date – including a previous seizure of drug proceeds from FISHER and her vehicle – investigators believe JOHNSON was removing drug proceeds from FISHER's vehicle.

16

46.     JOHNSON then left 3808 Eagle Claw in the minivan and drove directly to meet BRADFORD at his residence. JOHNSON remained there for only a few minutes and then left in the minivan. Investigators were unable to see if JOHNSON carried any items out of BRADFORD's residence. However, based on the intercepted telephone calls, investigators believe JOHNSON obtained the promised drug proceeds from BRADFORD during the visit.

47.     Electronic and visual surveillance revealed that after leaving BRADFORD's residence, JOHNSON drove directly to the Clayton, Missouri area. When he entered the area, agents intercepted a telephone call between JOHNSON and Ivana Booker (live in girlfriend of JOHNSON). The following is a portion of the conversation.

BOOKER: Alright, I'm about to cook them but I'm just gonna wait for you to come.

JOHNSON: Alright, I'm uh, I gotta stop at the bank, I'm like ten, I'm like ten minutes away.

BOOKER: So do I need to come down?

JOHNSON: Uh, I'll let you know when I leave the bank to come down, but you can put them steaks in.

48.     After this call, JOHNSON traveled to the area of a financial institution in the St. Louis, Missouri area and stopped for a few minutes. JOHNSON then traveled to the **target location**. Based on the investigation and their training and experience, investigators believe that JOHNSON deposited a portion of the proceeds at the financial institution and kept the rest of the proceeds with him at the **target location**.

49.     In the days before April 12, 2019, investigators had intercepted telephone calls and text messages wherein JOHNSON discussed and arranged having a woman deliver money to a subject in Chicago, Illinois on April 14, 2019 as payment for 150 pounds of cannabis to be delivered to JOHNSON in the near future.

17

50.     On April 12, 2019, approximately 7:43 p.m., video surveillance showed JOHNSON's minivan arriving at Capitol Storage Unit #190. JOHNSON removed a Neiman Marcus shopping bag from the storage unit, suspected to contain drug proceeds, and placed it in the minivan. JOHNSON then used loose clothing to cover the shopping bag. Later that evening, JOHNSON left the Springfield, Illinois area in the minivan and electronic surveillance unit data indicated the minivan traveled to Collinsville, Illinois. The data indicated the minivan stopped in the area of 100 S. Center Street in Collinsville. JOHNSON'S sister, GABRIELLE JOHNSON, lives at 120 S. Center apartment #300. The minivan remained there for only a couple minutes, presumably for JOHNSON to deliver the money for the Chicago meeting to GABRIELLE JOHNSON, then left and traveled directly to the **target location**.

51.     On April 14, 2019, investigators conducted surveillance of the meeting in Chicago, Illinois. Investigators observed a black 2010 Dodge Challenger arrive. The driver of the Dodge Challenger was later identified as GABRIELLE JOHNSON. Another female arrived and obtained a suitcase from the trunk of the Dodge Challenger. Agents intercepted telephone calls which indicated GABRIELLE JOHNSON had delivered $200,000 to the unknown female.

52.     On April 15, 2019, at approximately 10:57 a.m., JOHNSON sent a text message to his supplier that stated, "Yo so I just leave the crib that's only 200 she forgot the lil one but I can mail or or I'll be out next week on Tuesday." Based on these exchanges and the surveillance operation, agents believe that JOHNSON agreed to pay approximately $226,000 for the quantities of various types of marijuana. Based on the text message, GABRIELLE JOHNSON was supposed to transport two separate bags of money, one containing $200,000 and the "lil one" JOHNSON referred to contained approximately $26,000. The $200,000 was made by GABRIELLE JOHNSON on April 14, 2019, in Chicago. Those proceeds were contained in the Neiman Marcus

18

bag JOHNSON took from his Capitol Storage storage unit and delivered to GABRIELLE JOHNSON. The remaining $26,000, however, was in the "lil one" referenced in JOHNSON's text message. Investigators believe JOHNSON brought those proceeds with him from the **target location** since he only obtained one bag from the storage unit. The text message also indicates that JOHNSON can mail the proceeds to the source (mailing labels/shipping materials), or that he can deliver them when he travels to visit (travel records). At the time of the text message, GPS location data of JOHNSON's Cadillac Escalade showed it had just left the **target location**. The vehicle traveled directly to Kansas City, Missouri where investigators identified JOHNSON operating the Cadillac Escalade.

53.     Investigators thereafter intercepted calls between JOHNSON, the source, and the facilitator of the transportation of the incoming drug load setting the delivery date as May 1, 2019. On April 29, 2019, agents intercepted a call between JOHNSON and the source wherein the two further discussed payment for load and whether to provide the total payment for the load (balance due plus the transportation fee) to the courier/driver of the load or to associates in Chicago.

54.     During one such call, JOHNSON was located in Decatur, Illinois. The pertinent transcription of the call is as follows:

JOHNSON: …You still gotta let me know what you want me to do with [the payment].

SOURCE: Yea, you could just give the driver all of it. So that would be, what's that, 28-6 plus 25-2 is 53-8.

JOHNSON: OK. I gotta, I gotta, umm see where he pulling up to. I got your money put up like two hours from here and now I gotta see if I can go, I gotta, I just gotta time it. I got the [person arranging the shipment's] money sitting where the shit coming.

55.     Decatur is approximately two hours from the **target location**. Based on the investigation to date, as well as the training and experience of the investigative team, investigators

19

believe JOHNSON told the source that the payment for the person arranging the transportation of the load in Decatur (where the shipment was destined), but the payment for the source of supply was at the **target location** in St. Louis two hours away.

56.     Days following the May 1, 2019 marijuana delivery, intercepted communications between JOHNSON and the source revealed that JOHNSON arranged to pay the remaining money owed to the source for the May 1 delivery on May 9, 2019 in Chicago. Electronic surveillance on JOHNSON's Cadillac Escalade along with precise phone location data from JOHNSON's cellular phone, indicated that on May 8, 2019, JOHNSON and the Cadillac Escalade left the **target location** and traveled directly to Chicago, Illinois where JOHNSON remained overnight.

57.     On May 9, 2019, agents conducted surveillance of the prearranged meeting location in Chicago, Illinois. Agents observed JOHNSON arrive in the white Cadillac Escalade. An unknown female in a black Dodge Challenger arrived and entered the passenger area of white Cadillac Escalade while JOHNSON was still in the driver's seat. This was the same vehicle and woman that previously obtained $200,000 from GABRIELLE JOHNSON (see Paragraph 51). Within minutes, the female exited JOHNSON's vehicle and JOHNSON and the unknown female both left the meeting location. After the meeting, JOHNSON traveled directly to the **target location**.

58.     Based on the investigation to date, investigators believe that JOHNSON transported proceeds from the **target location** to Chicago to pay the outstanding balance of money owed to his source of supply.

59.     On May 15, 2019, at approximately 3:32 p.m. electronic surveillance unit data indicated JOHNSON's minivan had entered the Storage Masters West Main Storage facility. Video surveillance showed the minivan parking in front of Unit G7. JOHNSON was identified as

the driver and unlocked Unit G7. JOHNSON was observed inside the storage unit as well as several large cardboard boxes inside the unit. JOHNSON began moving packages from box to box which appeared consistent with vacuum sealed packages of marijuana. JOHNSON removed one of the cardboard boxes suspected to contain cannabis and placed the box in the back-storage area of the minivan. JOHNSON locked the storage unit and left the area. Electronic surveillance data indicated the minivan traveled directly to the known residence of co-conspirator TIMOTHY EALEY. Electronic surveillance indicated JOHNSON and the minivan then left EALEY's residence and traveled directly back to the **target location**. Based on information gained during this investigation, investigators believe JOHNSON obtained illegal narcotics from the storage unit, delivered them to EALEY, and then received proceeds from EALEY. JOHNSON then transported the drug proceeds back to the **target location**.

60.     On May 29, 2019, cellular telephone location data of JOHNSON and GPS location data of his Cadillac Escalade indicated JOHNSON left the **target location** in the Cadillac Escalade and drove directly to the Kansas City area. Surveillance followed the Cadillac Escalade directly to the apartment complex of JAMES ALLEN (see Paragraph 41). Surveillance observed JOHNSON park the Cadillac and exit carrying a backpack. ALLEN exited his apartment and greeted JOHNSON. ALLEN took possession of the backpack and walked back to his apartment. JOHNSON left in the Cadillac and traveled directly back to the **target location**. Based on information gained during the investigation, including the statement by WILLEY (see Paragraph 41), investigators believe JOHNSON had proceeds stored at the **target location** and delivered them to ALLEN.

61.     On June 4, 2019, cellular telephone location date of JOHNSON and GPS location data of his Cadillac Escalade indicated JOHNSON left the **target location** in the Cadillac and

drove directly to the Kansas City area. Surveillance again followed JOHNSON to the apartment complex of JAMES ALLEN. Surveillance observed JOHNSON park the Cadillac and exit carrying a backpack. JOHNSON walked towards the front door to ALLEN'S apartment and disappeared out of sight. JOHNSON walked back to the Cadillac and was not carrying the backpack. JOHNSON traveled directly back to the **target location**. Based on the investigation to date, investigators believe JOHNSON had proceeds stored at the **target location** and delivered them to ALLEN.

62.     On June 25, 2019, video surveillance footage and cellular telephone tower location data showed JOHNSON visited Unit G7 and removed suspected cannabis and/or currency. JOHNSON was observed arriving at Unit G7 in his Chevrolet Avalanche. JOHNSON unlocked the unit and removed a medium size suitcase and a white garbage bag and placed them both in the Chevrolet Avalanche. The suitcase was consistent with previous drug proceed seizures from JOHNSON and his co-conspirators and the garbage bag was consistent with storage and transportation of cannabis in previous surveillance.

63.     JOHNSON left the storage facility and met with EALEY and BURTON. All three entered EALEY'S residence and remained there for several minutes. JOHNSON and BURTON exited the residence and walked to the Chevrolet Avalanche. JOHNSON was observed opening the car door of the Chevrolet Avalanche, but investigators could not observe if JOHNSON removed any items from the vehicle or if JOHNSON delivered any items to BURTON. JOHNSON left in the Chevrolet Avalanche and cellular telephone location data indicated JOHNSON traveled directly to the **target location**.

## **BACKGROUND REGARDING DRUG TRAFFICKING ACTIVITIES**

22

64.     Based on my training and experience and that of the investigative team, I know the following:

a.     Drug traffickers often store documents and other items relating to the possession, manufacture, importation, exportation, and distribution of drugs and to the illegal proceeds of drug trafficking in their residences, stash houses, and cars where they are readily available and concealed from law enforcement.   These documents and items include invoices, shipping labels, tracking numbers, boxes, and envelopes.

b.     Drug traffickers commonly store drugs and drug paraphernalia, including packaging materials, cutting agents, and manufacturing tools, in their residences, stash houses, and cars where they are readily available and concealed from law enforcement.

c.     Drug traffickers keep books, receipts, notes, ledgers, and other records relating to their drug distribution activities.   Because drug traffickers often "front" drugs to their customers - that is, sell the drugs on credit - or receive drugs from their suppliers on credit, such records are necessary to keep track of the amounts paid and owed by/to their customers and suppliers.   These ledgers are more commonly known as "pay/owe sheets," and may be as simple as notations on miscellaneous pieces of paper or may be recorded more formally in notebooks or even computer spreadsheets.   "Pay/owe sheets" are frequently encoded in order to protect the identities of customers and suppliers.   Drug traffickers often keep such records in their residences, stash houses, and cars.   Such records are often stored electronically within the memory of telephones, computers, and personal digital assistants such as iPhone and Blackberry devices, which drug dealers often keep in their residences, stash houses, and cars.

23

d.      Drug traffickers commonly keep large sums of currency, financial instruments, precious metals, jewelry, gift cards, and other items of value, which are either the proceeds from drug sales or are intended for the purchase of drugs.  When drug traffickers amass such wealth, they often attempt to conceal it and its origin from discovery by law enforcement.  Drug traffickers use many different techniques to do so, including using digital currency, and using savings and checking accounts, securities, cashier's checks, money drafts and letters of credit to exchange drug proceeds into money that appears to come from a legitimate source.  Drug traffickers also use drug proceeds to purchase real estate or cars, and establish shell corporations and business fronts that they use to launder drug proceeds.  Drug traffickers often use fictitious or "straw-holder" owners to conceal the true ownership of real estate, cars, or other valuable items purchased with the proceeds of drug sales.  In addition, drug traffickers often use wire transfers, cashier's checks, and money orders to pay for drugs or other costs relating to their distribution activities.  Drug traffickers often keep these items of value, and records relating to them, in their residences, stash houses, and cars where they are readily available and concealed from law enforcement.  Records related to such items are often stored electronically within the memory of telephones, computers, and personal digital assistants such as iPhone and Blackberry devices, which drug dealers often keep in their residences, stash houses, and cars.

e.      Drug traffickers go to great lengths to hide and secure the drugs, drug proceeds, other items of value, and records relating to their drug business.  This is to safeguard those items against robbery and keep them hidden from law enforcement. Drug traffickers hide these items by storing them in secure locations, including safes, vaults, or other locked

24

containers, as well as in specially-constructed concealed compartments that are often found in cars used for drug trafficking. Other methods of concealment include the burial of items underground, the use of locked cars, trailers, out buildings, sheds, and exterior closets, the use of natural spaces within walls, furniture, cars, and other areas, and the use of sealed cans and canning machines.

f.       Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. These persons frequently maintain listings of names, aliases, telephone numbers, pager numbers, facsimile numbers, physical addresses, and email addresses, sometimes encoded and sometimes not encoded, for the purpose of contacting their suppliers, customers, transporters, and others involved in their illicit drug distribution activities. These records are typically maintained in their residences, stash houses, and cars, where they are readily available and concealed from law enforcement. Moreover, such records are often stored electronically within the memory of telephones, computers, and personal digital assistants such as iPhone and Blackberry devices, which drug dealers often keep in their residences, stash houses, and cars.

g.       Drug traffickers frequently possess firearms, ammunition, silencers, explosives, incendiary devices, and other dangerous weapons to protect their profits and supply of drugs from others who might attempt to forcibly take such items and harm the drug traffickers during transactions. Such weapons, which are often stolen or otherwise possessed illegally, are typically kept in their residences, stash houses, and cars where they are concealed from law enforcement and readily available.

25

h.      Drug traffickers often use two way radios, police scanners, video surveillance systems, and other counter surveillance equipment to prevent detection by law enforcement. Such items are typically kept in their residences, stash houses, and cars.

i.      Drug traffickers frequently take, or cause to be taken, photographs and videos of themselves, their criminal associates, their real and personal property, their weapons, and their drugs. Such items are often stored in their residences and cars, and on digital devices.

j.      Drug traffickers often use electronic devices such as cellular telephones, satellite telephones, pagers and text messaging devices, voicemail or answering machine systems, telephone calling cards, computers, email, and personal digital assistants such as iPhone and Blackberry devices in order to communicate with their suppliers, customers, transporters, and others involved in their illicit drug distribution activities. Drug traffickers often keep the documents and records described above on those devices. Drug traffickers often use multiple phones, including not only their own phones but also phones of family members and significant others, in order to avoid detection by law enforcement. Drug traffickers often keep these devices in their residences, stash houses, and cars where they are readily available.

## CONCLUSION

65.     Based on the foregoing, I believe that evidence, fruits, and instrumentalities of the target offenses, to include documents and proceeds, will be found at the **target location**, described herein.

66.     In view of the ongoing nature of the investigation, and the risk of harm to informants, cooperating witnesses, to agents, and to the investigation, which would exist should

26

the information in this affidavit be prematurely disclosed, I respectfully request that this affidavit

and associated records concerning this search be sealed until further order of the Court.


Respectfully submitted,

Detective Chad Ramey
Task Force Officer
Federal Bureau of Investigation

Subscribed and sworn to before me on July 9, 2019.

NOELLE C. COLLINS
UNITED STATES MAGISTRATE JUDGE

27

# LIST

1.  Books, records, receipts, notes, ledgers, computer hard-drives and disk records, and other papers relating to the transportation, ordering, purchasing and distribution of controlled substances;

2.  Telephone bills, invoices, packaging, cellular batteries and/or charging devices, cancelled checks or receipts for telephone purchase/service; cellular and/or landline telephones; digital and/or alphanumeric text (two-way) pagers; computers capable of e-mail and/or chat-room communication, answering machines; address and/or telephone books and papers reflecting names, addresses, and/or telephone numbers of sources of supply, of customers, and/or evidencing association with persons known to traffic in controlled substances or to facilitate such trafficking;

3.  Photographs, in particular photographs of co-conspirators, of assets, and/or of controlled substances;

4.  United States currency, precious metals, jewelry, and financial instruments, including, but not limited to, stocks and bonds, papers, titles, deeds and other documents reflecting ownership of vehicles and property utilized in the distribution of controlled substances or which are proceeds from the distribution of controlled substances;

5.  Books, records, receipts, pay stubs, employment records, bank statements and records, money drafts, letters of credit, money order and cashier's checks receipts, passbooks, bank checks and other items evidencing the obtaining, secreting, transfer and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of money;

6.  Papers, tickets, notes, schedules, receipts and other items relating to travel, including, but not limited to, travel to and from St. Louis, Missouri, and elsewhere; and

7.  Indicia of occupancy, residency, rental and/or ownership of the vehicles and/or premises described above, including, but not limited to, utility and telephone bills, cancelled envelopes, rental or lease agreements and keys.